BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| *In re: Suboxone Film Marketing, Sales Practices, and Products Liability Litigation* ) ) ) ) | MDL Docket No. _____ |

BRIEF IN SUPPORT OF MOTION FOR TRANSFER AND COORDINATION
UNDER 28 U.S.C. § 1407

Per 28 U.S.C.§ 1407 and Rule 6.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs Jeremy Schie, David Sorensen, Haleigh Graham, Teresita Badalamenti, Keith King, Santo Pietro, Steve Badalamenti, and Christian Miller submit this brief in support of their Motion for Transfer and Coordination for pretrial purposes of all currently field Suboxone film cases identified in the Schedule of Actions[1] and any subsequently filed tag-along cases involving similar facts or claims, to the United States District Court for the Northern District of Ohio.

There are currently at least 15 Suboxone film actions pending in five judicial districts in the United States. All actions allege similar wrongful conduct by Defendants that resulted in similar injuries. Given the nationwide scope of the sale and promotion of Suboxone film, it is likely that additional actions will be filed in jurisdictions throughout the United States. Transfer for consolidation or coordination is appropriate because each of the Actions and tag-along cases arise out of the same

---

[1] The Schedule of Actions is attached as Exhibit A. The Complaints in the Actions and their related docket sheets are attached as Exhibits A-1 through A-15.

Page **1** of 18

nucleus of operative facts, arise out of the same alleged wrongful conduct, will involve the resolution of similar questions of fact and law, and discovery will be substantially similar and involve many of the same documents and witnesses.

## BACKGROUND

Suboxone film Plaintiffs allege several product-liability claims against Defendants who designed, manufactured, and sold Suboxone film as a prescription drug that treats opioid use disorder.[2] Suboxone film is a combination of buprenorphine and naloxone designed to be ingested through oral absorption. Buprenorphine can be administered via transdermal patch, buccal or sublingual film, buccal or sublingual tablets, subdermal or subcutaneous implant, and intravenous or intramuscular injections.

Buprenorphine is a partial opioid agonist. It works on the same opioid receptors in the brain as Oxycontin or heroin. Buprenorphine interacts with those receptors without producing the same high as opioids. This helps patients suffering from opioid use disorder to not abuse opioids. Naloxone (commonly known as Narcan) is not a therapeutic aspect of the product. Rather, it is included to prevent abuse of buprenorphine, which can be snorted (in tablet form) or dissolved in liquid and injected. There is a product—Subutex—that is a buprenorphine-only form of the drug, which does not include naloxone.

---

[2] Patient Information for Suboxone (buprenorphine and naloxone) Sublingual Film (CIII) (available at https://www.suboxone.com/) (last accessed Nov. 13, 2023).

### A.   Defendants design Suboxone with an acidic formulation.

Citric acid and sodium citrate are included in the combined buprenorphine/naloxone Suboxone film as a "buffer." This buffer provides a low pH to maximize absorption of the buprenorphine and minimize absorption of the naloxone.[3] On the pH scale of acidity or basicity, a pH of less than seven indicates acidity and more than seven indicates basicity. Suboxone film Plaintiffs allege that Defendants intentionally selected an acidic pH of 3.5 for Suboxone film to maximize buprenorphine absorption and minimize naloxone absorption.[4] Plaintiffs allege that inclusion of these acidic buffers leads to dental erosion and decay.

### B.   Defendants stymie sales of Suboxone tablets to avoid generic competition and promote Suboxone film.

Suboxone was first introduced as an orphan drug in 2002 that was administered as a dissolvable tablet.[5] Knowing the tablet's orphan-drug status would expire in October 2009, Defendants stymied generic competition for Suboxone tablets by developing Suboxone as a dissolvable film, which the FDA approved on August 30, 2010.[6] Defendants thereafter pressured physicians to switch patients from tablets to

---

[3] US Patent 8,475,832 B2, Myers, *et al.*, Sublingual and Film Compositions, RB Pharmaceuticals Ltd. (July 2, 2013).

[4] Ex. A-1 (Sorenson Compl.) at ¶ 70.

[5] U.S. Food & Drug Administration, *Search Orphan Drug Designations and Approvals (Suboxone)* (available at https://www.accessdata.fda.gov/scripts/opdlisting/oopd/detailedIndex.cfm?cfgridkey=79093) (last accessed Nov. 13, 2023).

[6] Aquestive, *MonoSol Rx Announces Reckitt Benckiser FDA Approval of Suboxone Sublingual Film for Treatment of Opioid Dependence* (available at https://aquestive.com/suboxone-sublingual-film-opioid-dependence/) (last accessed Nov. 13, 2023); Fierce Biotech, *Reckitt Benckiser Pharmaceuticals Inc. Receives FDA Approval for Suboxone® (Buprenorphine and Naloxone) Sublingual Film C-11*

film. And in September 2012, Defendant Reckitt Benckiser announced that it would discontinue Suboxone tablets within six months.[7] Defendants executed this product hop under the pretext of alleged "safety" concerns that child access to Suboxone tablets was more likely compared to Suboxone film, which was individually packaged.[8] This behavior—crafted solely to secure an even longer period of market exclusivity and brand-name sale prices than orphan-drug status *already* provides—resulted in both criminal and civil repercussions.[9]

In 2020, two Indivior senior executives were criminally charged and convicted in relation to the product hop from tablets to film. Former medical director Timothy Baxter pleaded guilty to misdemeanor misbranding for "sending false and misleading information . . . related to the relative safety of Suboxone Film . . . around children."[10] The Acting U.S. Attorney explained that Baxter "overstated safety claims" regarding Suboxone film and contributed to the failure to provide honest and accurate

---

(Sept. 7, 2010) (available at https://www.fiercebiotech.com/biotech/reckitt-benckiser-pharmaceuticals-inc-receives-fda-approval-for-suboxone%C2%AE-buprenorphine-and) (last accessed Nov. 13, 2023).

[7] Reuters, *Reckitt to discontinue Suboxone tablets in U.S.* (Sept. 25, 2012) (available at https://www.reuters.com/article/us-reckitt-benckiser/reckitt-to-discontinue-suboxone-tablets-in-u-s-idINBRE88O0GQ20120925) (last accessed Nov. 13, 2023).

[8] *Id.*

[9] Ex. A-1 (Sorenson Compl.), ¶¶ 60–64.

[10] U.S. Department of Justice, *Former Medical Director of Suboxone Manufacturer Indivior Sentenced in Connection with Drug Safety Claims* (Dec. 17, 2020) (available at https://www.justice.gov/opa/pr/former-medical-director-suboxone-manufacturer-indivior-sentenced-connection-drug-safety#:~:text=Indivior's%20former%20CEO%2C%20Shaun%20Thaxter,for%20both%20Baxter%20and%20Thaxter.) (last accessed Nov. 13, 2023).

information about the drug.[11] Baxter was sentenced to six months' home detention and 100 hours of community service. Former Indivior CEO Shaun Thaxter pleaded guilty to the same charge as Baxter and was sentenced to six months in prison and ordered to pay $600,000 in fines and forfeiture.[12]

Before the criminal cases proceeded against Baxter and Thaxter, the Department of Justice announced corporate criminal and civil resolutions with several Defendants by which they would pay in excess of $2 billion, the "second-largest monetary resolution obtained by the Department of Justice in a case involving an opioid drug."[13]

On October 23, 2023, Defendant Indivior settled multiple antitrust lawsuits related to the tablet-to-film product hop for $385 million.[14] The lawsuits alleged that Indivior "illegally suppressed generic competition for its opioid addiction treatment Suboxone."[15] Various health plans and drug wholesalers claimed Indivior "switched to an oral film version of Suboxone from a tablet to extend its monopoly" after its exclusive rights to selling the tablet form expired in 2009.[16]

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Reuters, *Indivior to pay $385 million to end final Suboxone monopoly lawsuits* (Oct. 24, 2023 (available at https://www.reuters.com/legal/indivior-pay-385-mln-end-suboxone-monopoly-lawsuits-2023-10-23/) (last accessed Nov. 13, 2023).

[15] *Id.*

[16] *Id.*

### C. Defendants learn Suboxone causes dental decay but do nothing until the FDA mandated a warning about dental injuries.

Adverse events and published literature put Defendants on notice that the Suboxone tablet was associated with dental decay and erosion as early as 2007.[17] The FDA approved the application for Suboxone film on August 31, 2010.[18] The adverse-event reports continued after the launch of the film. By the end of 2021, Defendants were aware of at least 136 reports of adverse dental events in patients taking Suboxone.[19] The adverse event reports were bolstered by a growing body of literature demonstrating a connection between Suboxone use and a sudden decline in oral health.[20]

Based on this information, Defendants should have changed the Suboxone film prescribing information per the Changes Being Effected (CBE) regulation (21 C.F.R. § 314.70(c)(3)) but did not do so until June 2022.[21] Earlier in 2022, the FDA had advised manufacturers in an official safety communication that information about the risk of dental problems—including "tooth decay, cavities, oral infections, and loss of teeth"—should be added to the prescribing information and patient medication

---

[17] Ex. A-1 (Sorenson Compl.) at ¶ 73.
[18] *Supra,* note 8.
[19] Ex. A-1 (Sorenson Compl.) at ¶ 82.
[20] *Id.* at ¶¶ 65–66.
[21] *See* Suboxone Updated Prescribing Information (June 2022) (available at https://www.suboxone.com/pdfs/prescribing-information.pdf), § 5.13 (last accessed Nov. 13, 2023).

guide based on the mounting adverse event reports.[22] Defendants finally included such a warning in prescribing information in June 2022, but the medication guide for Suboxone film still does not warn of these risks.

Suboxone film Plaintiffs allege four identical claims: (1) strict products liability for failure to provide adequate warnings and instructions; (2) negligent failure to provide adequate warnings and instructions; (3) strict products liability for defective design; and (4) negligent design defect.

## LAW AND ARGUMENT

### I.  Consolidation is appropriate to manage the common issues in these cases justly and efficiently.

The fundamental purpose of multidistrict litigation is "to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491 (J.P.M.L. 1968). The goal of multidistrict litigation is to avoid "conflicting, disorderly, chaotic judicial action." *Id.* at 493. The Panel considers three factors to determine whether to authorize transfer and coordination of multidistrict actions. First, whether one or more common questions of fact are pending in different districts. Second, whether a transfer will serve the convenience of the parties and witnesses. And third, whether a transfer will promote the just and efficient conduct of the actions. 28 U.S.C. § 1407(a). Transfer is appropriate because all these factors weigh in favor of coordination.

---

[22] *See* FDA Drug Safety Communication (Jan. 12, 2022) (available at https://www.fda.gov/media/155352/download?attachment) (last accessed Nov. 13, 2023).

### A. The Suboxone film actions share common questions of fact.

Section 1407 does not require a "complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007). Transfer and coordination of the Suboxone film actions is appropriate because the Suboxone film Plaintiffs share common questions of fact and law, including whether (1) Suboxone film was defectively designed; (2) Suboxone film has been marketed with inadequate warnings regarding the risk of dental decay and erosion; (3) Defendants conducted inadequate testing on Suboxone film before making it available for use; and (4) Defendants engaged in negligent conduct resulting in Plaintiffs' injuries.

The actions share the same basic factual allegations that Defendants designed, manufactured, marketed, and sold a defective drug—Suboxone film—without revealing the serious risk of dental decay it posed. There are also numerous common questions of fact in the Suboxone film actions, including, for example, (1) when Defendants first learned of the connection between the use of Suboxone film and dental decay; (2) whether Suboxone film is defective in design because of its propensity to cause adverse effects on oral health where safer forms of administration were available and previously approved by the FDA; (3) whether Suboxone film is defective and unreasonably dangerous because any benefits associated with the film are far outweighed by the risks associated with its use; (4) whether Defendants failed to adequately warn physicians and consumers about the increased risk of dental injuries with Suboxone film use; (5) whether and to what extent Defendants used

spurious means to remove Suboxone tablets from the market in order to avoid generic competition and further promote the Suboxone film without adequate warnings; and (6) whether and to what extent Suboxone film causes dental decay and erosion.

All Suboxone film actions also share the same basic legal theory of liability. Specifically, that Defendants failed to warn adequately physicians and consumers about the risk of dental decay and erosion caused by Suboxone film, that Defendants failed to adequately test Suboxone film to fully elucidate the risk of permanent dental damage, that Defendants failed to provide proper instructions on the safe use of Suboxone film to avoid serious dental damage, and that Defendants defectively designed Suboxone film.

Each Plaintiff alleges claims for failure to warn and design defect and all Plaintiffs allege that use of a single drug, Suboxone film, caused a signature injury, dental decay and erosion. More particular individual injuries "and medical histories are not an obstacle to centralization when, as here[,] the actions share a common factual core." *In re Gardasil Prod. Liab. Litig.*, 619 F. Supp. 3d 1356, 1357 (J.P.M.L. 2022) (quoting *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d 1378, 1379 (J.P.M.L. 2018)). Alleging a common mechanism for Plaintiffs' injuries—the acidity of Suboxone film—makes centralization appropriate. *See also In re Bard Implanted Port Catheter Prod. Liab. Litig.*, No. MDL 3081, 2023 WL 5065100, at *1 (J.P.M.L. Aug. 8, 2023). Together, these factual and legal commonalities merit coordination. *See, e.g., In re AndroGel Prod. Liab. Litig.*, 24 F. Supp. 3d 1378, at 1379 (J.P.M.L. 2014) (centralizing "claims involving all testosterone replacement

therapies"); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1369 (J.P.M.L. 2020) (centralizing cases against Zantac and other ranitidine medications).

### B. Transfer will serve the convenience of the parties and promote the just and efficient conduct of the actions.

With these factual similarities, all actions will share the same core discovery, fact witnesses, and general liability on causation. Further, no case has advanced beyond the pleading stage, making now the ideal time for transfer. Centralization now will streamline proceedings, "eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. MDL 3084, --- F. Supp. 3d ---, 2023 WL 6456588, at *1 (J.P.M.L. Oct. 4, 2023).

Formally situating these cases in a single forum will streamline the discovery process. As discussed above, common core discovery will explore the allegations that Defendants defectively designed Suboxone film with an acidic pH level that causes severe dental decay, whether Defendants adequately tested Suboxone film, whether Defendants adequately monitored and reported adverse events relating to the drug's effect on oral health, and whether Defendants failed to warn of the risks of dental decay. Transfer and consolidation will ease the burden of discovery for both Plaintiffs' and Defendants' counsel. *See, e.g.*, *In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984) (noting that "prudent counsel will combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of case and a minimum of inconvenience to all concerned").

With 15 Suboxone film actions already pending in five district courts across the country, the risk of inefficiency and conflicting rulings is high. Coordinated discovery will benefit all parties, ensuring that depositions of key witnesses can be completed once. Further, Defendants' document productions can be reduced to a single repository to which all Plaintiffs' counsel have access. The Suboxone film Plaintiffs will also benefit from coordination amongst the various law firms representing them. Rather than pursuing disparate strategies in multiple districts, counsel can combine forces to eliminate duplicative discovery and motion practice while also avoiding inconsistent rulings.

Absent centralization, these cases will proceed independently, require duplicative discovery, including repetitive depositions of the same corporate personnel and expert witnesses. Transfer also brings the benefit of avoiding inconsistent rulings among district and appellate courts and economize judicial resources. All these factors support that the Suboxone film actions are suited for centralization under 28 U.S.C. § 1407.

## II. The Northern District of Ohio is the most suitable venue for this MDL and Judge Calabrese the most suitable jurist to preside.

Once it is determined that centralization is appropriate, the Panel determines the most suitable forum to do so. MANUAL FOR COMPLEX LITIGATION (4th), § 22.33, pp. 366–67. Upon transfer, the Panel should centralize these cases in the United States District Court for the Northern District of Ohio before the Honorable J. Philip Calabrese.

### A. The Northern District of Ohio is the most suitable venue.

Factors to guide the selection of the most appropriate forum include: (1) the location of parties, witnesses, and documents; (2) the accessibility of the proposed transferee district to parties and witnesses; and (3) the respective caseloads of the proposed transferee district courts. *See In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 931–32 (J.P.M.L. 1980) (discussing factors). A forum that satisfies these factors and that already has pending cases is favorable. *See* MANUAL FOR COMPLEX LITIGATION (4th), § 20.131, pp. 221 ("The panel uses no single factor to select the transferee district, but the Panel does consider where the largest number of cases is pending."). The most appropriate forum in this instance is the Northern District of Ohio.

#### 1. The Northern District of Ohio is conveniently located for all parties and witnesses.

The geographic scope of this litigation spans the nation from coast to coast. The Northern District of Ohio is centrally located and accessible for all parties and witnesses. Defendants are headquartered in Virginia, the United Kingdom, New Jersey, and Indiana. The Northern District of Ohio is a geographically central location to the American Defendants' various headquarters and therefore convenient for Defendants. *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) (ordering consolidation to the Northern District of Ohio where defendants were headquartered in New York, Connecticut, New Jersey, and Pennsylvania).

Centralization will not be impeded by the presence of more than one Defendant. Regardless of the number of Defendants, the Suboxone film actions implicate common fact questions regarding the defective design and improper marketing of Suboxone film, and the failure to warn of its risks. The potential for individualized factual issues "do[es] not—especially at this early stage of litigation—negate the efficiencies to be gained by centralization." *Id.* On the other hand, allowing the cases to proceed independently "raises a significant risk of inconsistent rulings and inefficient pretrial proceedings." *Id.*

### 2. The Northern District of Ohio is accessible for all parties and witnesses.

Convenience of access is another significant factor in the selection of an MDL forum. *See In re Worldcom, Inc., Sec. & ERISA Litig.*, 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002) (noting the conveniences of a metropolitan area with major airline service, hotel, and office accommodations). The Northern District of Ohio encompasses four metropolitan areas: Cleveland, Youngstown, Akron, and Toledo. The largest number of judges sit in Cleveland, Judge Calabrese among them. With its main division in Cleveland, the Northern District of Ohio is a convenient forum for all parties and witnesses. Cleveland is easily accessible by plane. Multiple major airlines serve the airport and offer numerous non-stop destinations to other major metropolitan areas.[23] The airport offers 115 daily nonstop departures[24] and

---

[23] Non-Stop Cities (available at https://www.clevelandairport.com/flight-information/non-stop-cities) (last accessed Nov. 13, 2023).

[24] Facts & Figures (available at https://www.clevelandairport.com/about-us/facts-figures) (last accessed Nov. 13, 2023).

Cleveland's airport is centrally located within 500 miles of 43 percent of the United States population.[25] Further, the airport is just 12 miles away from downtown Cleveland, where the federal courthouse sits.[26] If visitors do not wish to drive, they may travel by rail from the airport to Tower City Center, which provides direct access to the courthouse by an interior pedway connection. Visitors will also find numerous hotels and office locations within walking distance of the courthouse. The comparative affordability of northeast Ohio compared to other major metropolitan areas will serve to conserve the resources of all parties.[27] The Northern District of Ohio's central location in a large, but accessible and affordable, city offers convenience for parties, corporate witnesses, and all counsel.

### 3. The Northern District of Ohio has the capacity and experience to accept a new MDL.

The Northern District is not overburdened with other MDLs and maintains a reasonable case load, with 5,679 pending civil cases as of June 20, 2023.[28] With the appointment last year of three new district judges and seven jurists continuing to serve on senior status, the district can absorb the burdens of an MDL.

---

[25] *Id.*

[26] *Id.*

[27] *See, e.g.*, Erin McDowell and Erin Snodgrass, *The 25 US cities with the lowest cost of living, Business Insider* (Aug. 31, 2022) (ranking three cities in the Northern District of Ohio—Cleveland (No. 13), Akron (No. 10), and Toledo (No. 6)—among the most affordable) (available at https://www.businessinsider.com/us-cities-with-the-lowest-cost-of-living-2016-7) (last accessed Nov. 13, 2023).

[28] Table C-1 U.S. District Courts Civil Cases Commenced, Terminated, and Pending by Jurisdiction During the 12-Month Period Ending June 30, 2023 (available at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.uscourts.gov%2Fsites%2Fdefault%2Ffiles%2Fdata_tables%2Fstfj_c1_630.2023.xlsx&wdOrigin=BROWSELINK) (last accessed Nov. 13, 2023).

To that end, the district has already proven adept at handling multidistrict litigation. Judge Dan Polster presided over *In re: National Prescription Opiate Litigation*, MDL No. 2804 (J.P.M.L. 2017), *In re: Gadolimium Contrast Dyes Products Liability Litigation*, MDL No. 1909 (J.P.M.L. 2008), and *In re: Oral Sodium Phosphate Solution-Based Products Liability Litigation*, MDL No. 2066 (J.P.M.L. 2009); Judge Donald C. Nugent presided over *In re: Kaba Simplex Lockst Marketing and Sales Practices Litigation*, MDL No. 2220 (J.P.M.L. 2011); and Judge Patricia A. Gaughan presided over *In re: Vertrue Inc. Marketing and Sales Practices Litigation*, MDL No. 2044 (J.P.M.L. 2009). Based on the number of multidistrict litigations managed by the judges of the Northern District of Ohio, its Clerk's office is well-prepared to handle the administrative aspects of this matter.

### 4. The Northern District of Ohio has the most Suboxone film actions already pending.

The Northern District of Ohio has the most pending Suboxone film cases, and additional cases will continue to be filed there, including by undersigned counsel. Although Suboxone film is marketed and sold nationwide, Ohio bears a particularly strong connection to the opioid epidemic underlying the Suboxone film cases. *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. at 1379 (noting Ohio's "strong factual connection" to the litigation, "given that it has experienced a significant rise in the number of opioid-related overdoses in the past several years").[29]

---

[29] *See also* Lisa Clemans-Cope, Victoria Lynch, Emma Winiski, and Marni Epstein, *State Variation in Medicaid Prescriptions for Opioid Use Disorder from 2011 to 2018* (August 2019) (available at https://www.urban.org/sites/default/files/publication/100817/2019.08.19_av_state_medicaid_rx_oud_final_v3_4.pdf) (noting that Ohio was in the 90th percentile of states

Offering convenience and accessibility, minimal docket congestion, and substantial experience with MDLs, consolidation of these actions to the United States District Court for the Northern District of Ohio will uniquely serve the "just and efficient conduct of these actions." 28 U.S.C. § 1407(a).

### B. Judge Calabrese's well-rounded experience is ideal for presiding over this litigation.

The experience and knowledge of a particular judge is another important factor to consider in determining the best transferee forum. *See, e.g.*, *In re "Factor VIII or IX Concentrate Blood Prods." Prod. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993).

The Honorable J. Philip Calabrese is eminently qualified and well-suited to manage the complexity of an MDL. He has served in his current position since 2020 and previously practiced complex civil litigation. In his current position, he is a well-regarded jurist for his temperament, knowledge, and efficient docket management. He currently has the lowest number of pending civil cases in the district.

Before his appointment to the federal bench, Judge Calabrese served as a judge of the Cuyahoga County Court of Common pleas. He began his legal career by servicing as a judicial clerk to the Honorable Alice M. Batchelder of the United States Court of Appeals for the Sixth Circuit. He gained extensive practical experience working at three large law firms, often focusing on complex civil litigation that included class actions and multidistrict litigation, including product liability and

---

prescribing buprenorphine to Medicaid enrollees and the state with the fifth-highest buprenorphine prescribing rate between 2011 and 2018) (last accessed Nov. 13, 2023).

toxic torts.[30] He tried approximately 12 cases as a civil litigator.[31] Judge Calabrese also serves as adjunct faculty at Case Western Reserve University School of Law teaching a course on expert witnesses and scientific evidence, a topic highly relevant to managing the Suboxone film actions.[32]

Judge Calabrese has two Suboxone actions assigned to him and has indicated his willingness to preside over a Suboxone film MDL. Although this would be Judge Calabrese's first MDL as a judge, his qualifications and complex-civil-litigation experience cannot be doubted. Further, he will be able to draw on his district colleagues' experience in managing such matters, including Judge Polster's handling of the opioid MDL. The availability of a capable jurist like him weighs in favor of consolidation of these actions before him.

## CONCLUSION

Plaintiffs respectfully request that the Panel transfer the Suboxone film actions listed in the attached Schedule of Actions, and any tag-along cases, to the Northern District of Ohio for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407 before the Honorable J. Philip Calabrese.

---

[30] Porter Wright, *Calabrese Appointed to Cuyahoga County Common Pleas Court* (available at https://www.porterwright.com/media/calabrese-appointed-to-cuyahoga-county-common-pleas-court/) (last accessed Nov. 13, 2023).

[31] The Vetting Room, *Judge J. Philip Calabrese—Nominee to the U.S. District Court for the Northern District of Ohio* (available at https://vettingroom.org/2020/04/20/judge-j-philip-calabrese/) (last accessed Nov. 13, 2023).

[32] Case Western Reserve University School of Law, *Expert Witnesses and Scientific Evidence* (available at https://lawresearchguides.cwru.edu/c.php?g=1263423) (last accessed Nov. 13, 2023).

Dated: November 14, 2023

Respectfully submitted,

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold
**PEIFFER WOLF CARR KANE
 CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, Ohio 44139
(216) 589-9280
asletvold@peifferwolf.com

*Counsel for Plaintiffs Jeremy Schie, David Sorensen, Haleigh Graham, Teresita Badalamenti, Keith King, Santo Pietro, Steve Badalamenti, and Christian Miller*